Filed 1/11/21  In re A.Q. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.Q., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> STEPHANIE Q., <br><br> Defendant and Appellant. | F081434 <br><br> (Super. Ct. No. 517944) <br><br> **OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Jessica M. Ronco, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Poochigian, Acting P.J., Franson, J. and Snauffer, J.

Stephanie Q. (mother) appeals from an order following a Welfare and Institutions Code section 366.26[1] hearing at which the juvenile court terminated her parental rights to her daughter A.Q. Mother contends the juvenile court failed to apply the beneficial parent child relationship exception to defeat termination of parental rights. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

In May of 2017, mother brought then 19-month-old A. to the hospital with shoulder pain. It was discovered that she had a fractured right humerus. A. also had bruising that appeared to be from a separate incident, including a large bruise on her forehead, and what appeared to be finger marks on her upper right arm. Mother's explanation as to the injuries was inconsistent. Mother reported that she has two older children who were taken by Child Protective Services (CPS) but now living with their fathers.

According to mother, her male roommate had been caring for A., but they were no longer dating and he "never takes care of A[.]" Mother then stated that the roommate was taking care of A., but she did not think he would do anything to her. The roommate was living with mother until June 6, 2017, when he was to turn himself into jail on a weapons charge. Mother acknowledged signing a safety plan with the Stanislaus County Community Services Agency (agency) in February of 2017, agreeing that this roommate was not to live with her or be allowed to care for her children.

When mother spoke to an agency social worker, she spoke slowly and did not make eye contact. She reported being diagnosed with bipolar disorder and prescribed Seroquel and Zyprexa in the past but did not take the medications currently.

Mother had six prior CPS referrals, including three prior referrals in 2017.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

A. was placed in protective custody and the agency filed a section 300 petition alleging A. was at risk of harm. The petition alleged that the whereabouts of one alleged father, Gregory B., was unknown. A second possible father, Russell R., was a legal father, having been adjudged A.'s father by a default judgment.[2]

*Detention*

At the detention hearing May 24, 2017, a guardian ad litem was appointed for mother. The juvenile court ordered that, if recommended, mother could be referred for a psychological evaluation prior to the next hearing. Both mother and Gregory B. asserted Indian ancestry. The jurisdiction/disposition hearing was set for July 11, 2017, to allow for Indian Child Welfare Act (ICWA) noticing.

*Jurisdiction/Disposition*

The report prepared in anticipation of jurisdiction and disposition recommended that mother be offered services, but that both possible fathers be denied services pursuant to section 361.5, subdivision (a).

In her social history interview, mother described her childhood as "fucked up." She reported being continuously raped by her maternal grandfather between the ages of three and 15 and was also raped by a maternal uncle and one of her mother's boyfriends. She began cutting herself around age 12. She reported being diagnosed with depression, anxiety, and anger management issues, but claimed the anger calmed after she had children. Her three children all have different fathers and she has never been married. Mother described herself as "marked" with posttraumatic stress disorder (PTSD) and was prescribed Seroquel for sleep and Prozac for anxiety.

The agency staff noticed during visitation that mother needed improvement in both parenting skills and interaction with A. Mother did not appear emotionally attached

---

[2]     Neither father is a party to this appeal.

to A. After 50 minutes of the first scheduled two-hour visit, mother ended the visit, stating "I'm done, I have something to do."

Jurisdiction/disposition was continued to September 7, 2017, for a contested hearing and to perfect ICWA notice.

An addendum report stated that mother was making "good progress" in services but continued to appear to be emotionally disconnected to A. and did not provide enrichment for the child during visits or comfort her at the end. The foster parent indicated that A. was "very fussy" before visits with mother.

Mother completed a psychological evaluation in which psychologist Cheryl Carmichael established mother's IQ at 76, noting her low scores on information and vocabulary. Her ability to make reasoned decisions about facts and consequences of social situations was impaired. While mother was able to react appropriately to an occurrence, she could not figure out how to prevent a situation by seeing the big picture. For instance, mother knew A.'s injury was caused by leaving A. with her roommate, but she could not foresee that his behavior made him an inappropriate caretaker. The psychologist opined that mother had the ability to learn but was limited due to her concrete thinking; learning was possible due to her positive attitude. The psychologist recommended a parent mentor to work one on one with mother.

On September 7, 2017, the juvenile court found the petition true, removed A. from mother's custody and granted mother reunification services. Services were denied both alleged fathers. A six-month review was set for February 20, 2018.

*Six-Month Review*

The report prepared for the six-month review recommended services for mother be continued. A. had to be moved to a new home in January of 2018, due to aggressive behavior toward herself and others. Mother visited consistently, except for five missed visits due to illness.

At the six-month review hearing February 20, 2018, services were continued, and a 12-month review set for July 11, 2018.

*12-Month Review*

Prior to the 12-month review hearing, the caregiver filed a de facto parent request.

The report prepared for the 12-month review hearing recommended that reunification services for mother continue to the 18-month review hearing. During the reunification period, mother was unemployed and homeless and "couch surfing." While mother was working with the parent mentor, she was getting into conflicts and altercations with people in the community and declined assistance with finding housing. One report indicated that mother had been involved in an altercation with four females, one of whom ended up hospitalized. Although police were involved, mother was not charged.

Because A. showed issues with aggression and self-harm, she was evaluated and started with a treatment plan at Leaps and Bounds. Mother had begun cancelling visits on the day of the visit, causing A. to become upset and pull out her own hair. Mother wanted A. in counseling so she would understand that missed visits were not her fault, but mother failed to understand this expectation was not age appropriate for a two-year-old.

Visitation reports showed that, in addition to missing visits, mother continued to have limited interaction with A. When the parent mentor was in the room with mother during visits, mother was more engaged and spoke in less of a monotone cadence.

At the hearing on July 11, 2018, de facto parent status was granted to the caregiver. The remainder of the hearing was trailed to July 17, 2018, and mother assigned a new attorney.

On July 17, 2018, the agency indicated it was changing its recommendation to termination of services, and the matter set for a contested hearing August 21, 2018.

The addendum report filed for the contested hearing stated that mother was still homeless and making little progress in finding housing, having allowed her section 8 voucher to expire. Mother did not attend visits on June 28, July 19, and August 2, 2018. A. did not want to attend the visit on July 26, 2018, and threw a tantrum in the car, scratching her face and punching her legs.

A letter attached to the report from the de facto parent stated that A.'s social skills had improved, she was bonded with her foster siblings, and was very helpful at home. While her self-harming behavior had decreased, A. still pulled her hair, scratched or bit herself, and banged her head or squeezed herself causing bruises when nervous or anxious. The de facto family was working with her to have her use words to express her feelings. The de facto parent wrote that, while A. "loves her mom, … the visits are anxiety-provoking. When we tell A[.] that we are going to visit, she begins making excuses to try and stay home. A[.] leaves every visit with a far more aggressive attitude and pulls her hair again over the next several days before she returns to her usual self."

A contested review hearing was held over several days in August and September 2018. The juvenile court found that the agency offered mother reasonable services, but continued services with specific orders that the social worker and parent mentor assist mother with visits and teach her to use a calendar to track visits and appointments. The revised case plan required the parent mentor to focus on anger management, parent modeling during visits, appropriate expectations, and calendar management.

An 18-month review was scheduled for November 15, 2018.

*18-Month Review*

The report prepared for the 18-month review recommended services for mother be terminated. Mother's housing was still unstable, and the only plan she had was to move in with a former boyfriend with whom she had experienced domestic violence. Mother struggled in services, attending but not putting effort into working with the parent mentor. She specifically resisted use of a calendar, and showed no ability to plan for

6.

future issues, such as obtaining suitable housing, obtaining a driver's license, and looking for childcare if A. was returned to her. She was argumentative with the parent mentor and unwilling to discuss anger management. She spoke inappropriately with A. during visits.

In her Leaps and Bounds treatment program, A. was being treated for symptoms of PTSD. She continued to resist visits with mother with screaming and hitting behavior. The de facto parent encouraged A. to visit and provided reassurance to A. that she would return to the de facto parent after visits. A. requested she be called a different name, equating her name with being bad.

Mother missed four visits during the reporting period. While some visits went well, in others mother "appeared flat and lacked effect" or left A. to play on her own.

A contested hearing was set for December 17, 2018. An addendum report indicated mother was not attending a required support group, she declined referrals and refused to keep a paper calendar, stating she was keeping her appointments on her phone. For housing, mother suggested either her old boyfriend, with whom she had a domestic violence history, or with her own mother, whose boyfriend was a registered sex offender.

The parent mentor reported that mother's interactions with A. during visits showed "acquisition of both knowledge and skill based parenting techniques and abilities," but that mother "can have lapses in both skill sets."

The matter was again continued, this time to January 24, 2019, and mother directed to continue with her services.

An addendum report for the continued hearing noted a recent incident in which mother had an altercation and became so angry that she "blacked out." She only recalled a police officer standing in front of her.

The parent mentor began facilitating and supervising community visits, and the first visit had gone well. The de facto parent submitted a letter and caregiver report which detailed A.'s continued distress with visits, her self-harm before and after visits.

7.

While A. stated that she had a good time during visits with mother, she also said mother made her "mad and sad."

The 18-month hearing was again continued, first to February 15, 2019, and then to March 1, 2019.

An addendum report indicated that mother was sentenced to probation and a criminal protective order protecting A. was implemented as a result of the 2017 injuries to A.

The hearing eventually began on April 5, 2019 and concluded May 16, 2019. At that time, the juvenile court terminated reunification services and set the matter for a section 366.26 hearing on September 12, 2019. Mother was allowed twice monthly visits and A. was to be made available for a bonding study.

*Section 366.26 Hearing*

The report prepared for the section 366.26 hearing recommended termination of parental rights and selection of adoption as the permanent plan. A. had been placed in her current placement since January 19, 2018, and the de facto family wished to adopt her.

Visits between mother and A. occurred twice a month. Mother's interactions with A. were described as either "okay" or non-existent.

After the agency filed a motion to conduct its own bonding study, the matter was continued to January 13, 2020.

The agency's addendum report included a bonding study done by psychologist Anthony Urquiza which indicated an evaluation took place before mother began serving her jail sentence and was completed after her release. During the one month mother served in jail, A. did not inquire about or mention mother. During a psychological interview and testing, mother related her traumatic sexually abused childhood, and tested as suffering from PTSD, major depressive disorder, and somatization disorder. Mother reported having symptoms of depression, anxiety, and anger, and being unable to sleep.

Mother reported that she was committed to reunification with A. and said she enjoyed visits with her, but she expressed frustration that A. calls her by her first name instead of "mom."

Dr. Urquiza spoke to the de facto mother, who reported that, due to A.'s self-harming behavior, she had arranged for A.'s therapy sessions to occur immediately after visits. She did not tell A. about visits until shortly before they were to occur, and A. did not talk about mother between visits and had never mentioned missing her. Another child in the de facto family's home had recently been reunified with his mother, making A. more attached to the de facto mother.

Dr. Urquiza described the relationship between A. and mother as a "positive/weak" relationship because the visits are pleasant, but mother is "distracted, unavailable or inadequate" due to her own depression and being traumatized, which have rendered her unable to be emotionally responsive to A. Dr. Urquiza described the relationship as "playmate-like" rather than one of a parent/child.

Dr. Urquiza opined that A. would not be "greatly harmed" if the relationship was terminated, but instead would likely be distressed if the relationship with her de facto parent and family was terminated.

Dr. Urquiza testified at the section 366.26 hearing, describing the interaction between mother and A. as containing no praise from mother to A., which is "really the foundation to some significant problems in that relationship." Dr. Urquiza noted that mother offered A. no praise even when she was being observed and evaluated.

Dr. Urquiza testified that A.'s unhealthy behaviors had lessened over the time she had been in the care of the de facto parent. He opined that lack of contact with mother would enable A. to move forward and further develop her relationship with the caregiver family. Dr. Urquiza's observation of mother and A.'s interaction was that they were able to play for a while and had a "casual friendly" visitor relationship.

9.

The de facto mother testified that A. had been in their home for almost two years. She had to wait until just before to tell A. about upcoming visits with mother, and A. never asked to visit. At a recent visit, A. had to be bribed to go back into the visitation room. After the visit, she was happy to have seen mother, but also happy to go back with the de facto mother.

Mother's counsel called Dr. Carmichael, who had performed the psychological evaluation of mother early in the case. Dr. Carmichael testified that A. clearly considers her de facto siblings to be her siblings, and the bond between mother and A. had diminished significantly due to the time in foster care and limited exposure to each other. Dr. Carmichael opined that the parent/child bond still existed. When asked if terminating mother's parental rights would have a negative impact on A., the psychologist stated that she saw mother's relationship with A. "as being positively additive to the stable and warm and rich relationship that she has in the current home she is in." While Dr. Carmichael opined that severing all contact was not specifically detrimental, continued contact "in some limited fashion" would help A.'s "struggle with how she got where she is over time.… It can be beneficial, but not at this point essential, to her well-being."

The juvenile court subsequently found A. adoptable and that, while mother had visited regularly, she did not meet the second prong of the beneficial parent/child relationship exception. Citing the testimony of both experts, one being mother's own expert, the juvenile court found that severing contact between mother and A. would not be detrimental. Mother's parental rights were terminated.

Due to issues related to COVID-19 and extension of filing deadlines, the notice of appeal in this matter was attempted to be filed several times, rejected, and ultimately the subject of a petition for writ of mandate before this court in case No. F081348. On July 16, 2020, in case No. F081348, this court ordered the notice of appeal be filed within 15 days. The notice of appeal was filed on July 17, 2020.

## DISCUSSION

I.     THE BENEFICIAL PARENT/CHILD RELATIONSHIP EXCEPTION TO TERMINATION OF PARENTAL RIGHTS

Mother's only contention on appeal is that the juvenile court abused its discretion when it declined to apply the beneficial parent/child relationship exception to termination of her parental rights. We affirm.

Under section 366.26, the statutory preference is to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (b)(1).) "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption. (§ 366.26, subd. (b)(1).) There are statutory exceptions which " 'permit the court, in *exceptional circumstances* [citation], to choose an option other than ... adoption.' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.) " '[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) The beneficial parent-child relationship exception is one of the statutory exceptions.

Section 366.26, subdivision (c)(1)(B)(i) provides the court shall terminate parental rights unless "[t]he court finds a compelling reason for determining the termination would be detrimental to the child" where "[t]he parents have maintained regular visitation

11.

and contact with the child and the child would benefit from continuing the relationship." It is the parent's burden to show termination of parental rights would be detrimental to the child because an exception applies. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646.)

With regard to the factual findings the juvenile court must make (whether the parent has maintained regular visitation and/or whether the beneficial parent child relationship exists), if the court does not find the parent met his or her burden of proving these findings, the question on review is "whether the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Breanna S., supra,* 8 Cal.App.5th at p. 647.) The specific question is "whether the ... evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We review a court's determination that the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption for abuse of discretion. (*In re Breanna S.*, at p. 647.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)[3]

---

[3] Appellate courts have adopted differing standards of review for the beneficial parent-child relationship exception: substantial evidence (see, e.g., *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165); abuse of discretion (see, e.g., *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449); and, more recently, as we have applied here, a "hybrid" standard (*In re Breanna S., supra,* 8 Cal.App.5th at p. 647.) The issue of the proper standard to apply is currently pending before the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.

We note there is not much practical difference between the different standards of review. Under any of these standards of review, the practical differences between them are slight because they all give broad deference to the juvenile court's judgment. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We should interfere only if under all

While the juvenile court found that mother had consistently visited A., we conclude that the juvenile court did not abuse its discretion by finding any benefit derived from continuing the relationship did not outweigh the stability and permanence A. would gain from being adopted and did not constitute a compelling reason not to terminate parental rights.

" '[B]enefit from continuing the [parent/child] relationship,' " within the meaning of section 366.26, subdivision (c)(1)(B)(i) has been interpreted to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) " ' "[F]requent and loving contact" is not sufficient' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643) as "[i]nteraction between natural parent and child will always confer some incidental benefit to the child" (*In re Autumn H.*, *supra*, at p. 575). In evaluating the issue of whether the relationship outweighs the well-being the child would gain from being adopted, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/ child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

Factors to consider in deciding if the parent child relationship exception applies include the age of the child, the portion of the child's life spent in the parent's custody, the positive and negative effect of interaction between parent and child, and the child's particular needs. (*In re C.B., supra,* 190 Cal.App.4th at p. 124.)

---

the evidence viewed most favorably in support of the juvenile court's action, it finds no judge could reasonably have made the order. (*Ibid.*) We note we find no error under any standard of review.

At the time of the section 366.26 hearing, A. was just over four years old and had been out of mother's custody since she was 19 months old. Mother contends A. was removed from her custody only because she was "too trusting [in] and leaving A[.] with an inappropriate caregiver who hurt her," and that her many visits with A. proved that there was a strong bond between the two of them and severing that bond would be detrimental to A. While there were positive aspects to mother's visits with A., there was also copious evidence of A.'s reluctance to visit and be with mother, including self-harm and negative behaviors surrounding the visits. At times, A. had to be coaxed into visits and the de facto parent arranged for therapy appointments to occur closely after visits ended in order to get A. back on track. In some visits, mother is described as not engaged and she failed to provide A. with positive reinforcement. She was heard making inappropriate comments to A. Early on, mother appeared overwhelmed and left the first visit early. A. never requested visits with mother and she never asked about mother outside of visits. Further, mother's visits never progressed beyond supervised visits.

Most importantly, two bonding studies were done regarding the nature of the relationship between mother and A. While mother's bonding study, done by Dr. Carmichael, initially indicated there would be detriment if the relationship was severed on direct examination, that opinion was tempered in her testimony. Instead Dr. Carmichael opined that severing all contact was "not specifically detrimental," and although the relationship could be "beneficial" at some point, it was not now "essential" for A.'s "well-being." Dr. Carmichael agreed that giving A. the permanence of a safe, stable home with the de facto parents was important.

Dr. Urquiza opined that severing the relationship with mother and A. would not be detrimental and found no benefit to sustaining it at all. Dr. Urquiza opined that mother, due to her traumatic upbringing, was unable to form a positive strong relationship with A., and severance from mother would enable A. to move forward and develop her relationship with the de facto family.

Mother insists that, taking Dr. Carmichael and Dr. Urquiza's opinions into consideration, her parental rights need not be terminated. Instead, she argues, that allowing A. to continue in foster care under guardianship would allow mother to continue her parental role and, at this point, still provide A. with consistency by remaining in her de facto parent's home. However, "[g]uardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.) "Adoption is the Legislature's first choice because it gives the child the best chance at [a full emotional] commitment from a responsible caretaker." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1348.)

We find no basis for reversing the juvenile court's order terminating mother's parental rights.

## DISPOSITION

The juvenile court's order is affirmed.